IRVING, J., for the Court.
¶ 1. The Chancery Court of Hinds County granted Jennifer LeBlanc a divorce from Curtiss Andrews on the ground of habitual cruel and inhuman treatment. The chancellor divided the marital property and debt between the divorcing parties. With respect to the couple’s minor child, Aimee, the chancellor utilized the Albright factors in awarding custody to LeBlanc. The chancellor ordered Andrews to pay child support for the benefit of the minor child and afforded Andrews unsupervised visitation on a graduated schedule. The chancellor also ruled that LeBlanc was entitled to rehabilitative alimony in the form of payment of certain debts by Andrews. After the final judgment was entered, LeBlanc asked for reconsideration of certain parts of the judgment, which the chancellor denied. Feeling aggrieved by the chancellor’s ruling, LeBlanc appeals and asserts the following issues: (1) whether the chancellor erred as a matter of law by assigning certain debts to Andrews as a form of rehabilitative alimony to LeBlanc, but otherwise refusing to order periodic, limited duration payments of rehabilitative alimony, and (2) whether the court abused its discretion in declining to order Andrews to undergo a mental examination as provided in Rule 35 of the Mississippi Rules of Civil Procedure.
¶ 2. Finding no error, we affirm.
FACTS
¶ 3. On March 7, 2003, Andrews filed a complaint for divorce, seeking a divorce on the grounds of habitual cruel and inhuman treatment or, alternatively, irreconcilable differences. LeBlanc answered, denying that Andrews was entitled to a divorce on fault-based grounds; she also counterclaimed for a divorce on the ground of habitual cruel and inhuman treatment. Additionally, LeBlanc requested that the court grant her sole physical and legal custody of Aimee. LeBlanc also petitioned the court for the following relief: (1) rehabilitative alimony, (2) assignment of certain credit cards and mobile phone debts to Andrews, and (3) an order requiring Andrews to repay debt that she incurred after he allegedly abandoned his family in January 2003. LeBlanc further requested that visitation between Andrews and Aimee be supervised.
¶ 4. Shortly thereafter, the chancellor entered a temporary order requiring supervised visitation and an allotment of $1,700 per month paid to LeBlanc through *685 Andrew’s employer, the United States Coast Guard.[1]
¶ 5. In October 2003, LeBlanc requested that the court order a mental examination’ of Andrews and that the court compel Andrews to answer discovery requests. An order was subsequently entered requiring Andrews to completely respond to Le-Blanc’s discovery requests, but the court reserved ruling on the motion for a mental examination. In November 2003, LeBlanc again requested answers to discovery and. asked that Andrews be ordered to either produce records of his Batterer’s Intervention Program and Domestic Violence Assessment or undergo a mental examination. In February 2004, the chancellor granted LeBlane’s motion for supplemented discovery' responses and ordered Andrews to make arrangements for payment of the entire allotment previously ordered. However, the chancellor refused to allow discovery of Andrews’s previous mental and psychological evaluations and denied LeBlanc’s motion for a mental examination.
¶ 6. Ultimately, a trial on the merits was held. The chancellor rendered a bench opinion in which she granted LeBlanc a divorce on the ground of habitual cruel and inhuman treatment and divided the parties’s debts and assets. The chancellor also awarded LeBlanc custody of Aimee. The chancellor further ordered Andrews to pay child support and afforded him unsupervised visitation. Finally, the chancellor ruled that LeBlanc was entitled to rehabilitative alimony in the form of payment of certain debts by Andrews.[2]
¶ 7. After the final judgment was entered, LeBlanc asked, for reconsideration of certain parts of the judgment. In particular, “she requested that the part of the final judgment providing for visitation be stayed in favor of supervised visitation during the pendency of the appeal.” The chancellor dictated a bench ruling in which she corrected a mathematical error in the child -support award, but denied all other relief.
¶ 8. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
STANDARD OF REVIEW
¶ 9. Our scope of review for appeals-from chancery courts is limited: “[We] will not disturb the chancellor’s opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.”. Samples v. Davis, 904 So.2d 1061, 1064(¶ 9) (Miss.2004) (citing Holloman v. Holloman, 691 So.2d 897, 898 (Miss.1996)). “In order for [us] to say that the chancellor has abused his discretion, there must be insufficient evidence to support his conclusions.” Id. (citing Tucker v. Tucker, 453 So.2d 1294, 1296-97 (Miss.1984)).
ANALYSIS AND-DISCUSSION OF THE ISSUES

1. Rehabilitative Alimony

¶ 10. LeBlanc argues that the chancellor erred in concluding'that an eq *686 uitable property division could also serve as rehabilitative alimony. LeBlanc maintains that the evidence is irrefutable that she was urged to become a full-time mother and homemaker -after the birth of the couple’s daughter, that she and her children were left destitute when Andrews left the marital home with the remaining money in their checking account and terminated his payroll deposit to that account, and that she was forced to borrow $13,000 from family members to bridge the gap between being an unemployed mother of two small children to becoming a full-time, single mother of two.[3] According to Le-Blanc, this is exactly the type of situation for which rehabilitative alimony is designed.
¶ 11. LeBlanc points out that equitable distribution has traditionally been used as a mechanism to untangle a divorcing Couples’s economic relationship to the extent possible by equitably dividing whatever property the couple accumulated during the marriage whereas rehabilitative alimony “is an equitable mechanism which allows a party needing assistance to become self-supporting without becoming destitute in the interim.” LeBlanc maintains that in short marriages like hers (about two and one-half years) where there is little in the way of assets to equitably divide, other than debt, the chancellor should consider an award of rehabilitative alimony. Le-Blanc further points out that she is about $60,000 in debt. She arrived at this figure by adding the amount of marital debt allocated to her by the chancellor and the amount of the debt she incurred to make ends meet after Andrews left the marital home. She argues that the chancellor should have considered the additional financial debt she had to incur in order to make the transition from an unemployed parent to a single, full-time worker.
¶ 12. Andrews counters that, in awarding rehabilitative alimony, the chancellor is not restricted as to what form the alimony may take. He maintains that the award may be in the form of payment of cash and/or payment of debts or liabilities. He contends that the chancellor correctly noted that the parties’s martial estate largely consisted of debts and that the chancellor accordingly assigned certain portions of the debt to Andrews as rehabilitative alimony in an effort to assist LeBlanc post-divorce.
¶ 13. The Mississippi Supreme Court has stated the following in relation to rehabilitative alimony:
Rehabilitative alimony is awarded to parties who have put their career on hold while taking care of the marital home. Rehabilitative alimony allows the party to get back into the working world in order to become self-sufficient. Therefore, rehabilitative alimony is not considered during equitable distribution. “Rehabilitative periodic alimony” is an equitable mechanism which allows a party needing assistance to become self-supporting without becoming destitute in the interim.... “Rehabilitative periodic alimony” is not intended as an equalizer between the parties but is for the purpose of allowing the lesser able party to start anew without being destitute in the interim
Lauro v. Lauro, 847 So.2d 843, 849(¶ 15) (Miss.2003).
¶ 14. Contrary to LeBlanc’s assertion, her situation is not of the type for which rehabilitative alimony was designed. Rehabilitative alimony is designed to allow a party “to become self-supporting without becoming destitute in the interim.” Although Andrews did leave the marital *687 home, there is no evidence in the record that LeBlanc was left destitute as a result. The record reveals that, shortly after he left the marital home, Andrews began paying LeBlanc $1,200 to $1,700 per month.[4] The record also reveals that LeBlanc was working as a paralegal when she stopped working in August 2001. LeBlanc reentered the workforce in February 2004, and, at the time of trial, was gainfully employed as a secretary with a gross monthly income of $2,666.66. There is nothing in the record to indicate that LeBlanc had to receive additional training or had to be retrained in order to facilitate her entrance back into the workforce. The record does not reveal, and we know of no reason why, LeBlanc did not seek and obtain employment throughout 2003. Therefore, we fail to appreciate how Le-Blanc’s situation would entitle her to rehabilitative alimony. We are cognizant of the fact that the crux of LeBlanc’s argument is that, even with the $1,700 monthly allotment from Andrews, she had to borrow additional money to cover existing marital debts.[5] The chancellor heard Le-Blanc’s testimony about the circumstances which led to her having to borrow additional money, and, for whatever reason, decided that this circumstance did not warrant the imposition of periodic alimony. For the above stated reasons, we find that the chancellor did not abuse her discretion by awarding LeBlanc rehabilitative alimony in the form of payment of certain debts by Andrews.

2. Mental Examination

¶ 15. LeBlanc argues that the court should have ordered Andrews to undergo a mental examination before granting him unsupervised visitation with Aimee. LeBlanc relates several incidents which she thinks demonstrates that it would not be in Aimee’s best interest to have unsupervised visitation with Andrews:
(1). LeBlanc returned home to find Andrews, fully dressed, on top of Hailey (her daughter from a previous relationship) who was lying on the floor. Andrews got up, laughed, and said that they were playing “squish.” Hailey said that she was watching television when Andrews came into the room and laid down on top of her. Hailey said that Andrews never told her that they were playing “squish” before lying down on top of her.
(2). LeBlanc and Hailey both stated that Andrews would yell, curse, slam and throw things when he would not get his way or when he felt that LeBlanc was not paying enough attention to him or was showing Hailey too much love and attention.
(3). As Andrews was dressing Aimee, who was at that time six months old, Le-Blanc saw Andrews yell at Aimee and then yank her around and tell her to sit still while he was dressing her.
(4). When Aimee was still too young to sit erect, Andrews put her on the handle of a grocery store shopping cart, holding her with one hand and pushing the cart with the other hand.
*688 (5). LeBlanc stated that Andrews once put Aimee on the handlebars of a bicycle when she was still at a young age.
(6). Andrews was supposed to be watching Aimee while she was outside playing, but he was preoccupied with other things and allowed Aimee to wander close to the highway without attempting to stop her.
(7). LaBlanc stated that Andrews once got mad at her and threw a screwdriver at her.
(8). Andrews once got very upset and violent with LeBlanc in public.
(9). Andrews’s deviant sexual desires and behavior, including his desire to nurse from his wife’s breast while she was nursing Aimee (allegedly done in the presence of Hailey), his desire to have sex with LeBlanc while she was nursing Aimee, and his masturbation in front of LeBlanc, Hai-ley, and Aimee.
(10). The recommendations of a marriage counselor that Andrews should not have unsupervised visitation with Aimee.[6]
¶ 16. Despite the above incidents, the chancellor refused to order a mental examination of Andrews and also, refused to order supervised visitation with Aimee. In making her ruling, the chancellor stated:
Ms. LeBlanc has requested that the visitation be supervised and that that is based upon a history of violence and inappropriate conduct and putting the minor child in danger. The Court did have testimony from the other minor child that lived with these parties. I believe Hailey was about nine — she may have been eight when I spoke with her, but she’s very bright, very articulate. And in talking with her, she could not provide an instance where she really felt unsafe or she feared Mr. Andrews in the sense that would concern the Court. She represented that there were some things she did not like about him and really a lot of that came from her concerns that she received from her mother. So based upon what I’ve heard, I haven’t heard anything that would convince me that if Mr. Andrews visited with Aimee unsupervised that she would be in danger.
¶ 17. We agree with the chancellor’s assessment and treatment of this issue. The record simply does not support that Andrews had ever harmed Aimee in the past or that he would present an immediate danger to her health and safety in the future. It is true that much testimony was adduced about difficulties the parties had experienced and how certain incidents had negatively affected Aimee. However, nothing was shown, proven, or established pertaining to any harm that had befallen Aimee while in Andrews’s custody. The chancellor heard the testimony given in support for supervised visitation and, nevertheless, chose not to order supervised visitation. The chancellor, “being the only one to hear the testimony of the witnesses and observe their demeanor, is in the best position to judge their credibility.” In re *689 Estate of Carter, 912 So.2d 138, 143(¶ 18) (Miss.2005) (citing Culbreath v. Johnson, 427 So.2d 705, 708 (Miss.1983)). “Moreover, since the chancellor is best able to determine the credibility of the witness’ testimony, it is not [an appellate court’s] province to undermine the chancellor’s authority by replacing the chancellor’s judgment with our own.” Id. (citing Madden v. Rhodes, 626 So.2d 608, 616 (Miss.1993)).
¶ 18. For the above stated reasons, we decline to overrule the chancellor decision to afford Andrews unsupervised visitation with Aimee.
¶ 19. In reference to the mental-examination, Rule 35(a) of the Mississippi Rules of Civil Procedure states in pertinent part:
When the mental or physical condition (including the blood group) of a party or of a person in the custody or under the legal control of a party is in controversy, the court in which the action is pending may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner or to produce for examination the person in the party’s custody or legal control,
(emphasis added). The above language clearly indicates that whether to order a party to undergo a mental examination is at a chancellor’s discretion. The chancellor in the present case found no evidence or testimony during discovery, litigation, or any other time that would warrant ordering a mental examination of Andrews. The chancellor heard testimony from various witnesses about why Andrews should have been ordered to undergo a mental examination. The chancellor also heard from Andrews about why there was no need to order a mental examination of him. “When conflicting testimony on the same issue is presented, the chancellor sitting as trier must determine which version he finds more credible.” Bratcher v. Sur-rette, 848 So.2d 893, 896(¶ 16) (Miss.Ct.App.2003). “The weight and worth of a witness’s testimony [is] solely for the chancellor to determine.” Id. (citing Doe v. Doe, 644 So.2d 1199, 1207 (Miss.1994)).
¶ 20. Faced with conflicting testimony, the chancellor determined what weight and worth to give each witness’s testimony and decided not to order a mental examination of Andrews. As previously-stated, it is not our province to undermine the chancellor’s authority by replacing her judgment with our own. Based on these facts, we decline to find that the chancellor abused her discretion in deciding not to order a mental examination of Andrews.
¶ 21. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, CHANDLER, GRIFFIS, BARNES, ISHEE AND ROBERTS, JJ„ CONCUR.

. More specifically, the temporary order stated that “Andrews shall pay temporary support on the first of each month beginning May 1, 2003, in cash until a United States Coast Guard (USCG) allotment from his pay check can be arranged and thereafter by such allotment, the sum of $1,700.00 per month.”

. Specifically, the chancellor ruled that “[a]s a form of rehabilitative alimony, the father [Andrews] shall pay the balances due, includ- • ing penalties, late charges, and interest, on the Discover Card and Sears Card, now totaling approximately $6,103.87, within 60 days of the date of this judgment, making at least minimum payments in the meantime.”

. LeBlanc has another child, Hailey, who is not Andrew's.

. Beginning in February 2003, the Coast Guard arranged for a monthly allotment of $1,200 to be paid to LeBlanc out of Andrews's payroll check. In April 2003, the parties went to court and the court entered a temporary order requiring Andrews to pay $1,700 per month beginning May 1, 2003.

. LeBlanc provided the court with promissory notes evidencing money she borrowed but failed to provide any supporting documentation to help substantiate her contention that she borrowed the money to assist in meeting certain financial obligations.

. Elizabeth Callender, a licensed clinical social worker and family therapist, counseled Andrews, LeBlanc, and Hailey about some of the problems the family was experiencing. She testified that from her sessions with Andrews and what they revealed, she felt that it "would be very beneficial for a third party to monitor the visits [between Andrews and Aimee] for a period of time.” Sami Riley, a certified domestic violence counselor, performed a domestic violence assessment on Andrews at the insistence of and by referral agreement with the Coast Guard. After personally meeting with Andrews and interviewing LeBlanc by phone, Riley generated a report in which she recommended that "neither Mrs. LeBlanc nor her children be alone with her husband until further appropriate measures have been taken to avoid unintended consequences.”