## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

### NO. 2017-CA-01731-COA

MARTHA G. BRADSHAW                                                          APPELLANT

v.

LOYD E. BRADSHAW                                                            APPELLEE

DATE OF JUDGMENT:                11/17/2017
TRIAL JUDGE:                     HON. D. NEIL HARRIS SR.
COURT FROM WHICH APPEALED:       JACKSON COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:          MARK V. KNIGHTEN
ATTORNEY FOR APPELLEE:           GARY L. ROBERTS
NATURE OF THE CASE:              CIVIL - CUSTODY
DISPOSITION:                     AFFIRMED - 08/13/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE CARLTON, P.J., GREENLEE AND McCARTY, JJ.**

**GREENLEE, J., FOR THE COURT:**

¶1.     In 2017, Loyd Bradshaw was granted a divorce from Martha Bradshaw. Martha appeals the judgment of the Jackson County Chancery Court claiming the chancellor erred by (1) granting Loyd a divorce on the ground of adultery; (2) denying her a divorce on the ground of habitual cruel and inhuman treatment; (3) failing to recuse; (4) awarding physical custody of the minor child to Loyd; (5) dividing the property; and (6) denying her request for attorney's fees. Loyd filed a conditional cross-appeal. However, because we affirm the chancellor's judgment, Loyd's cross-appeal is moot.

### FACTS AND PROCEDURAL HISTORY

¶2.     Loyd and Martha Bradshaw were married in September 1989. On February 19, 2016,

Loyd filed a complaint for divorce, alleging uncondoned adultery and habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Subsequently, Martha filed an answer and a counter-complaint. In her answer, she denied the allegations against her but asserted several affirmative defenses. In her counter-complaint, she requested a divorce, alleging habitual cruel and inhuman treatment or, in the alternative, irreconcilable differences. Martha also requested custody of their minor child, J.B.,[1] alimony, and attorney's fees.

¶3.     After a hearing, on April 6, 2016, the family master entered a temporary order. Loyd and Martha were awarded temporary legal custody of J.B., and after a "relatively equal *Albright* analysis,"[2] the family master awarded temporary physical custody to Loyd. Martha was awarded visitation with J.B. And she was awarded temporary use and possession of the marital home. However, she was ordered to pay the property taxes and mortgage and insurance payments on the house.

¶4.     Subsequently, Martha filed a motion to set aside the temporary order. She asserted that the family master placed too much weight on J.B.'s preference when determining custody. She also asserted that the order left her with insufficient financial resources. After a hearing, the chancellor denied Martha's motion.

¶5.     Trial began on March 24, 2017, and Loyd's first witness was J.B.[3] Thirteen-year-old

---

[1] Loyd and Martha had two children: Jordan and J.B. We use initials to protect the identity of the minor child who was born in 2003.

[2] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

[3] By agreement, neither Loyd nor Martha were present during J.B.'s testimony.

J.B. testified that he had a close relationship with both of his parents, but he expressed a desire to continue living with Loyd. According to J.B., prior to his parents' separation, Martha would leave on most weekends and not return until 3:00 a.m. or 4:00 a.m., if at all. Whereas Loyd had "been there all the time."

¶6. Then Martha testified as an adverse witness. Loyd's attorney asked Martha whether she had engaged in an extramarital affair, and Martha's attorney asserted her (Martha's) Fifth Amendment right against self-incrimination. At that point, the chancellor granted Loyd a divorce on the ground of adultery.

¶7. Then Loyd testified. According to Loyd, Martha left almost every Friday night and would not return until sometime between 4:00 a.m. and 6:00 a.m. on Saturday, "or maybe not even then." Loyd testified that he never suspected that Martha was having an affair. But on or about December 23, 2015, he received a text message that suggested otherwise. Loyd testified that when he confronted Martha in January 2016, she admitted to being with someone else at least four or five times. According to Loyd, he was heartbroken.

¶8. Loyd moved out of the marital home on February 14, 2016. He testified that he had previously inherited a double-wide trailer and approximately one acre of land ("the Big Bend property") from his mother. According to Loyd, prior to the separation, Martha rented the property to a third party for approximately one year. Loyd testified that the rent money was deposited into his and Martha's joint checking account, and money from the same account was used to pay the property taxes and insurance payments. Both Loyd and Martha agreed that the income from renting the property was enough to cover the expenses. Loyd explained

3

that he and J.B. did not move into the Big Bend property after the separation because it was uninhabitable. Instead, they moved into a rental house, and Martha remained in the marital home.

¶9. According to Loyd, J.B. had a good relationship with both of his parents. However, Loyd believed that J.B.'s relationship with him was better and that physical custody with him was in J.B.'s best interest.

¶10. After Loyd rested his case-in-chief, the chancellor and attorneys discussed the effect of the judgment of divorce on Martha's coverage under Loyd's health-insurance plan. Because the divorce would have effectively terminated Martha's coverage, the chancellor set the divorce aside and reserved ruling on the ground for divorce until the second day of trial.

¶11. The trial resumed several months later on September 15, 2017. In support of her request for a divorce on the ground of habitual cruel and inhuman treatment, Martha testified that Loyd was inattentive to her throughout the marriage. According to Martha, when Jordan was a baby, Loyd left them for three months. Although Loyd returned, Martha testified that the marriage was never the same. Martha also testified that when J.B. was a baby, Loyd would leave them on the weekends. And according to Martha, there were several occasions when she was hospitalized, and Loyd visited for brief periods of time. Martha testified that Loyd gave her the silent treatment for two to three weeks at a time. And she testified that Loyd began sleeping on the couch in September 2015, ignoring her unless he wanted to have sex.

¶12. After Martha rested her case-in-chief, Loyd moved to dismiss Martha's counter-

4

complaint for divorce. At that point, Martha moved to reopen her case-in-chief so that her sister, Lisa English, could testify. Loyd objected to the reopening of Martha's case as well as to English's testimony. According to Loyd, English was not identified as a possible witness prior to trial. However, the chancellor held Loyd's objections in abeyance and allowed English to testify.

¶13. According to Martha's sister, Loyd treated Martha like she owed him something. She testified that Loyd allowed Martha to take care of everything. And he would not speak to Martha for weeks. According to English, Loyd's inattentiveness caused Martha to be emotional and withdrawn.

¶14. The chancery court entered its final judgment, granting Loyd a divorce on the ground of adultery. Both parties retained joint legal custody of J.B. However, the chancellor determined that it was in J.B.'s best interest to remain in Loyd's physical custody. Martha was awarded visitation with J.B., and she was ordered to pay $430 per month in child support.

¶15. The chancellor awarded the marital home to Martha. She was ordered to continue paying the property taxes and mortgage and insurance payments on the house. The marital home was appraised at $80,000, with the secured indebtedness on the house totaling $67,830.87. The equity in the marital home was therefore $12,169.13. Martha was awarded half of Loyd's 401k account valued at $188,589.88, equaling $94,294.94. The chancellor then reduced that award by the equity in the marital home, or $12,169.13, ordering that Martha receive $82,125.81 from the 401k. She was also awarded half of Loyd's retirement

5

security plan. The retirement security plan was valued at $170,186.54. Therefore, Martha was awarded $85,093.27. Martha was also awarded the Chrysler Sebring valued at $4,000 and the Chevrolet Trailblazer valued at $5,000.

¶16. The chancellor classified the Big Bend property (valued at $25,000) as separate property and awarded it to Loyd. Loyd was awarded half of his 401k ($94,294.94) plus the equity in the marital home ($12,169.13) for a total of $106,464.07. Loyd was also awarded half of his retirement security plan ($85,093.27). And he was awarded a camper valued at $8,000, an F-250 valued at $4,500, and an F-150 with $5,220.59 in equity.[4]

¶17. With respect to the debts, Loyd was ordered to pay the "Handyline debt," and Martha was ordered to pay the "Keesler debt."[5] Otherwise, both parties were responsible for their own debts. Loyd was ordered to provide health-insurance coverage to Martha for six months. And the chancellor denied Martha's requests for alimony and attorney's fees.

¶18. Subsequently, Martha filed a motion for reconsideration, alleging that the chancellor's ruling was contrary to the overwhelming weight of the evidence. The court denied Martha's motion, and she filed her notice of appeal. Shortly thereafter, Loyd filed his notice of a cross-appeal.

## STANDARD OF REVIEW

¶19. "This Court's standard of review in domestic-relations matters is extremely limited." *Stuckey v. Waid*, 195 So. 3d 872, 875 (¶13) (Miss. Ct. App. 2016) (quoting *Phillips v.*

---

[4] The F-150 was valued at $33,890; however, there was a $28,669.41 lien on it.

[5] The parties' updated Rule 8.05 disclosures indicate that the amount of the Handyline debt was $1,933.26, and the amount of the Keesler debt was approximately $36,000.

*Phillips*, 45 So. 3d 684, 692 (¶23) (Miss Ct. App. 2010)). "We 'will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused [his] discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal [standard].'" *Id*. (quoting *Samples v. Davis*, 904 So. 2d 1061, 1064 (¶9) (Miss. 2004). However, questions of law are reviewed de novo. *Id*.

**DISCUSSION**

I. **Whether the chancellor erred by granting Loyd a divorce on the ground of adultery.**

¶20. "Adultery may be proven by either direct evidence or, because of its 'secretive nature,' circumstantial evidence." *Id*. at 875 (¶14) (citing *Dillon v. Dillon*, 498 So. 2d 328, 330 (Miss. 1986)). "To prove adultery by circumstantial evidence, the plaintiff must provide clear and convincing evidence supporting a finding of: (1) an adulterous inclination, and (2) a reasonable opportunity to satisfy that inclination." *Id*. (citing *Atkinson v. Atkinson*, 11 So. 3d 172, 177 (¶20) (Miss. Ct. App. 2009)). When a chancellor misperceives the correct legal standard, the error becomes one of law and is reviewed de novo. *Brooks v. Brooks*, 652 So. 2d 1113, 1117 (Miss. 1995).

¶21. Here, the chancellor made the following findings of fact and conclusions of law:

> At the trial, Loyd testified that he believed that Martha was having an extramarital affair during the marriage. When questioned about this affair, Martha pled the Fifth Amendment and refused to answer. Loyd also propounded interrogatories to Martha in which he asked her to name the individuals with which she had sexual relations during the marriage. (Exhibit No. 1). Martha also invoked her Fifth Amendment rights in her response to this interrogatory. The Mississippi Supreme Court has held that someone refusing to answer questions about an alleged affair is clear and convincing evidence sufficient to satisfy the evidentiary requirement to prove adultery.

7

*Brooks v. Brooks*, 652 So. 2d 1113, 1118 (Miss. 1995).

¶22. We find the chancellor misperceived the correct legal standard. In *Brooks*, Jane testified that her husband, Robert, had given numerous gifts to another woman—Beverly. *Id*. Jane also believed she had enough evidence to prove that Robert had been involved in an adulterous relationship with yet another woman—Phyllis. *Id*. "At trial, when Robert was asked about the alleged relationship with Phyllis . . . , he pled the Fifth Amendment and refused to answer." *Id*. Our supreme court held that "the uncontradicted evidence proffered by Jane was sufficient to satisfy the evidentiary criterion . . . that requires clear and convincing proof of Robert's adulterous inclinations." *Id*. The Mississippi Supreme Court did not hold that Robert's *refusal to answer questions* was clear and convincing evidence that he committed adultery or had adulterous inclinations. Rather, the court held that the *uncontradicted evidence proffered by Jane* was sufficient evidence. Concerning a witness's "taking the Fifth" in civil cases, the trier of fact may draw an adverse inference from a defendant's refusal to testify. *Gibson v. Wright*, 870 So. 2d 1250, 1260 (¶42) (Miss. Ct. App. 2004). However, we have failed to find a case that allows a divorce to be granted based solely on that inference.

¶23. Although the chancellor in this case initially granted Loyd a divorce based on Martha's refusal to answer questions, that judgment of divorce was set aside. And although the chancellor's final judgment indicated that the divorce was granted for the same reason, after reviewing the record de novo, we find that substantial evidence exists to sustain a divorce granted on the ground of adultery by clear and convincing evidence.

8

¶24. At trial, J.B. testified that his mother would leave at night and not return until 3:00 a.m. or 4:00 a.m., if at all. Similarly, Loyd testified that Martha would leave almost every Friday night and not return until sometime between 4:00 a.m. and 6:00 a.m. on Saturday. Loyd also testified that in January 2016, he questioned Martha about having an affair, and she admitted to being with someone else at least four or five times. We find that the adverse inference from Martha's refusal to testify combined with the uncontradicted evidence proffered by Loyd as corroborated by J.B. was sufficient to prove Martha's adultery by clear and convincing evidence.

¶25. Martha also asserts that because the chancellor granted a divorce immediately after she pled the Fifth Amendment, she was prevented from raising affirmative defenses. However, as discussed, the chancellor's initial judgment of divorce was set aside on March 30, 2017. During the second day of trial, on September 15, 2017, Martha testified as to why she believed she was entitled to a divorce on the ground of habitual cruel and inhuman treatment. For Martha to now assert that she was unable to raise affirmative defenses to adultery is disingenuous. This issue is without merit.

**II.** **Whether the chancellor erred by failing to grant Martha a divorce on the ground of habitual cruel and inhuman treatment.**

¶26. This Court has held that

[h]abitual cruel and inhuman treatment may be established by a showing of conduct that either (1) endangers life, limb or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or (2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

9

*Tedford v. Tedford*, 856 So. 2d 753, 756 (¶11) (Miss. Ct. App. 2003). The offended spouse must prove habitual cruel and inhuman treatment by a preponderance of the evidence. *Id*.

¶27. This case does not require an analysis of the "danger" part of the habitual cruel and inhuman treatment test. Martha did not testify that Loyd's conduct rendered the relationship unsafe. Therefore, this Court must determine whether the evidence supports the granting of a divorce under the "unnatural and infamous" part of the test.

¶28. On appeal, Martha argues that Loyd's inattentiveness throughout the marriage was enough to establish habitual cruel and inhuman treatment. At trial and on appeal, Martha asserted that when Jordan was a baby, Loyd left for approximately three months. Although the marital relationship resumed, she stated that it was "never really the same." Martha also asserted that when J.B. was a baby, Loyd would leave them on the weekends. According to Martha, there were several occasions when she was hospitalized, and Loyd visited for brief amounts of time. Martha testified that Loyd gave her the silent treatment for two to three weeks at a time throughout the entire marriage. And she testified that in September 2015, Loyd began sleeping on the couch, ignoring her unless he wanted to have sex.

¶29. "[I]t is well settled that 'more than mere unkindness or rudeness, or incompatibility or want of affection is required to support a finding of cruel and inhuman treatment.'" *Id*. at 756 (¶13) (quoting *Shorter v. Shorter*, 740 So. 2d 352, 357 (¶24) (Miss. Ct. App. 1999)). Loyd's conduct does not rise to the level of "unnatural and infamous" behavior, which supports a granting of divorce. *Id*. at (¶11). Accordingly, we find that the chancellor did not abuse his discretion by denying Martha a divorce on the ground of habitual cruel and

10

inhuman treatment.

¶30.    Martha also asserts that where both parties are at fault the chancellor must determine which party's conduct was the proximate cause of the deterioration of the marital relationship and the divorce itself.  However, the chancellor determined that only one party was at fault in this case—Martha.  Therefore, this issue is without merit.

### III.    Whether the chancellor should have recused.

¶31.    Martha claims the chancellor was not impartial and should have recused sua sponte after granting Loyd a divorce on the ground of adultery on March 24, 2017.  She asserts that she was punished for pleading the Fifth Amendment.  And she contends that additional evidence of the chancellor's partiality "surfaced when . . . [he] challenged [her] concerning her hearing disability."[6]

¶32.    It is well established that "[a] judge is required to disqualify himself if a reasonable person, knowing all the circumstances, would harbor doubts about his impartiality." *Tubwell v. Grant*, 760 So. 2d 687, 689 (¶7) (Miss. 2000) (quoting *Jenkins v. Forrest Cty. Gen. Hosp.*, 542 So. 2d 1180, 1181 (Miss. 1988)).  This Court "presumes that a trial judge is qualified and unbiased, and this presumption may only be overcome by evidence which produces a reasonable doubt about the validity of the presumption." *Id*. (citing *Bredemeier v. Jackson*, 689 So. 2d 770, 774 (Miss. 1997)).  "The decision to recuse or not to recuse is one left to the

---

[6] During Martha's testimony, the court reporter asked her to speak up.  Martha stated that she spoke quietly because she had a hearing impairment and wore hearing aids.  The chancellor told her, "I wear hearing aids too.  And you can speak up. . . . That's not a good reason."  After some additional discussion, the chancellor stated, "I'm sorry, but I'm discounting your reason.  In other words, I don't believe it.  Speak up."

11

sound discretion of the trial judge, so long as he applies the correct legal standards and is consistent in the application." *Id*. (quoting *Collins v. Joshi*, 611 So. 2d 898, 902 (Miss. 1992)).

¶33.    Here, Martha did not file a motion asking for the chancellor to recuse. This argument was not raised until her appeal. Our supreme court has stated that "it will not allow a party to take [her] chances with a judge about whom [she] knows of grounds for recusal and then, after [she] loses, file [her] motion." *Id*. at (¶8). "Where the party knew of the grounds for the motion or with the exercise of reasonable diligence may have discovered those grounds, and where that party does not [file a timely motion], the point will be deemed waived." *Id*. Nothing prevented Martha from filing a timely motion to recuse. Therefore, we find that Martha waived this issue.

### IV.    Whether the chancellor erred by awarding physical custody of J.B. to Loyd.

¶34.    The Mississippi Supreme Court has established that "[t]he best interest of the child is paramount in any child-custody case." *Roberts v. Eads*, 235 So. 3d 1425, 1428 (¶12) (Miss. Ct. App. 2017) (quoting *Smith v. Smith*, 97 So. 3d 43, 46 (¶8) (Miss. 2012)). In determining a child's best interest, the chancellor considers the following factors:

> (1) the child's age, health, and sex; (2) the parent with the continuity of care prior to the separation; (3) the parent with the best parenting skills and the willingness and capacity to provide primary child care; (4) the parents' employment and the responsibilities of that employment; (5) the parents' physical and mental health and age; (6) the emotional ties of the parent and child; (7) the parents' moral fitness; (8) the child's home, school, and community record; (9) the child's preference at the age sufficient to express a preference by law; (10) the stability of the parents' home environments and employment; and (11) other factors relevant to the parent-child relationship.

*Id.* (citing *Albright*, 437 So. 2d at 1005).

¶35. This Court has noted that "[a]n *Albright* analysis is not a mathematical equation." *Id.* at (¶13) (quoting *Hall v. Hall*, 134 So. 3d 822, 827 (¶19) (Miss. Ct. App. 2014)). We "cannot reweigh the evidence and must defer to the chancellor's factual findings so long as they are supported by substantial evidence." *Id.* Although "the *Albright* factors are important, . . . the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Id.*

¶36. Martha claims the chancellor misapplied several *Albright* factors. Specifically, she contends that the chancellor erroneously found that the employment of the parents as well as the home, school, and community record of the child were neutral factors. She also contends that the chancellor erred by finding that the continuity-of-care and parenting-skills factors favored Loyd. And she believes the chancellor placed too much weight on J.B.'s preference to live with Loyd.

### a. Employment of the Parents

¶37. In the final judgment, the chancellor made the following findings with respect to Loyd's and Martha's employment:

> Martha works for Charter [F]inancial as a financial advis[o]r. She goes to work . . . around 9:15 a.m. . . . and comes home at 4:30 p.m. It is not a full-time job. Loyd works as a serviceman and underground technician for Singing River Electric Power Association. He works from 8:00 a.m. to 5:00 p.m. five days a week. Neither Loyd nor Martha's employment prevent[s] them from caring for the minor child. This factor favors neither party.

¶38. Martha asserts that the chancellor did not consider her flexible work schedule. At trial, Martha testified that she could set her own hours. However, Loyd testified that his job was flexible as well. After reviewing the record, we conclude that substantial evidence

supports the chancellor's finding that this factor favors neither party.

### b. Home, School, and Community Record of the Child

¶39. With respect to J.B.'s home, school, and community record, the chancellor made the following findings:

> [J.B.] makes As and Bs and sometimes Cs in school. He is a member of his school's golf team. Both parties have extended family in the area that [J.B.] may visit with at his leisure. This factor favors neither party.

¶40. Martha asserts that she was the only parent to take J.B. to church before and after the separation. However, Loyd testified that he would take J.B. to church on Wednesdays and Sundays when J.B. was not with Martha. After reviewing the record, we conclude that substantial evidence supports the chancellor's finding that this factor favors neither party.

### c. Continuity of Care

¶41. With respect to which parent had the continuity of care, the chancellor made the following findings:

> Loyd has had primary physical custody of [J.B.] since the Temporary Order entered on April 6, 2016. Both parties testified that they shared the child[-]rearing responsibilities equally during the marriage. This factor slightly favors Loyd.

¶42. Martha asserts that she was J.B.'s primary caretaker. At trial, Martha testified that she raised J.B. and "did everything for [him]." However, she admitted that Loyd helped some. When Loyd was asked who the primary caretaker was prior to the separation, he said, "I think we both done our equal share." Loyd testified that he "was always there" and did "whatever [he] needed to do." But he explained that when he offered to help with J.B., Martha indicated that she would handle it. This was consistent with J.B.'s testimony. For

14

example, J.B. testified that prior to the separation, his mother would take him to doctor appointments, but sometimes his father would come too. Loyd was J.B.'s primary caretaker after the separation. After reviewing the record, we conclude that substantial evidence supports the chancellor's finding that this factor slightly favors Loyd.

### d.    Parenting Skills

¶43.    The chancellor made the following findings with respect to Loyd's and Martha's parenting skills:

> [J.B.] and Loyd testified that Martha would sometimes leave home on the weekends and not return until 4 a.m., if she returned at all. [J.B.] also testified that his mother would check him out of school often because he was sick. Martha further testified that she had issues getting [J.B.] to respect her, while Loyd stated he did not have these problems with the minor child. This factor slightly favors Loyd.

¶44.    Martha asserts that J.B. became disrespectful after the separation. But at trial, she admitted that his behavior had improved. Loyd testified that he told J.B. that he needed to respect his mother and encouraged their relationship.

¶45.    Martha also asserts that Loyd allowed J.B. to play baseball against medical advice. However, at trial she testified that she was not sure what exactly the doctor advised. According to Loyd, the doctor indicated that J.B. needed to stay off the baseball field. So Loyd gave the doctor's excuse to J.B.'s coach and let the coach and J.B. decide when he could play again. Loyd testified that Martha was present when this occurred. And J.B. testified that he did not play baseball until he felt better.

¶46.    Finally, Martha asserts that Loyd took J.B. to a golfing event instead of a dental appointment. However, Loyd testified that the appointment was an orthodontist's

15

appointment, and he rescheduled the appointment.

¶47. This Court has held that the chancellor is in the best position to judge the parties' credibility. *LeBlanc v. Andrews*, 931 So. 2d 683, 688 (¶17) (Miss. Ct. App. 2006). After reviewing the record, we conclude that substantial evidence supports the chancellor's finding that this factor slightly favors Loyd.

### e. Preference of the Child

¶48. With respect to the preference of the child, the chancellor made the following findings:

> [Mississippi Code Annotated section] 93-11-65(1)(a) [(Rev. 2013)] states, "[t]he chancellor may consider the preference of a child of twelve (12) years of age or older as to the parent with whom the child would prefer to live in determining what would be in the best interest and welfare of the child." [J.B.] has expressed a desire to live with Loyd. This factor favors Loyd.

¶49. Martha asserts that the chancellor placed too much weight on J.B.'s preference. However, the record does not support Martha's claim. The chancellor considered the relevant *Albright* factors, and there is no indication that the chancellor placed undue weight on this factor. Therefore, this issue is without merit.

### V. Whether the chancellor erred in his division of the property.

¶50. Martha makes a number of claims regarding the chancellor's classification and division of the property. For clarity, we address these claims together.

¶51. "When dividing marital property, chancellors are directed to (1) classify the parties' assets as marital or separate; (2) determine the value of those assets; (3) divide the marital estate equitably based upon the factors set forth in *Ferguson*[*v. Ferguson,* 639 So. 2d 921

16

(Miss. 1994)]; and (4) consider the appropriateness of alimony if either party is left with a deficiency." *Baker v. Baker*, 250 So. 3d 502, 505 (¶7) (Miss. Ct. App. 2018) (quoting *Ewing v. Ewing*, 203 So. 3d 707, 711-12 (¶11) (Miss. Ct. App. 2016)).

¶52.    First, Martha claims the chancellor erred by classifying the Big Bend property as separate property.  In the alternative, she argues that the Big Bend property was converted from separate property to marital property.  Separate property, such as an inheritance, may lose its status as such if the party commingles the asset with marital property or uses it for familial benefit. *McKissack v. McKissack*, 45 So. 3d 716, 720 (¶18) (Miss. Ct. App. 2010).

¶53.    However, in *Marter v. Marter*, 95 So. 3d 733 (Miss. Ct. App. 2012), the appellant argued that the chancellor erred by classifying his wife's sixty acres of inherited property as her separate property. *Id*. at (¶11).  In support of his argument, he pointed to "his maintenance of the property, the fact that the property [was] titled jointly, and the fact that he paid the property taxes from the couple's joint checking account." *Id*. at 737 (¶14).  This Court noted that the maintenance efforts, which included occasional bush hogging, were de minimis. *Id*. at 738 (¶14).  This Court also was not persuaded that the separate property converted to marital by virtue of joint titling. *Id*. at (¶15).  And this Court noted that it had previously held that "property-tax payments are traceable and do not transmute separate property into marital." *Id*. at (¶16) (citing *Brock v. Brock*, 906 So. 2d 879, 888 (¶50) (Miss. Ct. App. 2005)).

¶54.    In this case, Loyd inherited the Big Bend property from his mother.  The deed reflects that the property was conveyed to Loyd and his mother as joint tenants with full rights of

17

survivorship. According to Loyd, his mother died in 2011 or 2012. Prior to Loyd and Martha's separation, Martha rented the property to a third party for approximately one year and deposited the rent money into their joint checking account. Martha used money from the same account to pay the insurance payments and property taxes on the house. Both Martha and Loyd agreed that the income generated from renting the property was sufficient to cover the expenses. In addition to renting the property, Martha testified that she cleaned the property. Because Martha's cleaning was minimal, and her contributions by paying property taxes and insurance are readily traceable, we find that the chancellor properly classified the Big Bend property as separate property.

¶55. Next, Martha asserts that the chancellor erred by deducting the amount of equity in the marital home ($12,169.13) from her fifty-percent share of Loyd's 401k. However, in dividing the property, the chancellor considered all of the relevant *Ferguson* factors including the parties' contributions to the stability and harmony of the marital and family relationship. After reviewing the record, we cannot say that the chancellor's ruling was an abuse of discretion.

¶56. Next, Martha claims the chancellor gave her a disproportionate amount of debt. However, the parties submitted original and revised financial disclosures. And according to the revised disclosures, the only joint debts were the Keesler Federal Credit Union debt and the Handyline debt. The remaining debts were separate. The chancellor ordered Martha to pay the Keesler debt as it was tied to the second mortgage on the marital home. And the chancellor ordered Loyd to pay the Handyline debt. Otherwise, the chancellor ordered that

both Loyd and Martha were responsible for their own debts. The chancellor's ruling was consistent with this Court's holding that "[s]eparate property is not subject to equitable distribution." *Brown v. Brown*, 797 So. 2d 253, 256 (¶6) (Miss. Ct. App. 2001) (citing *Ferguson*, 639 So. 2d at 929).

¶57. Finally, Martha claims that the chancellor should have awarded her alimony. However, "[i]t is long[-]standing law in Mississippi that failure to cite relevant authority in support of an issue obviates the appellate court's obligation to review the issue." *Evans v. Evans*, 912 So. 2d 184, 188 (¶12) (Miss. Ct. App. 2005) (citing *Mann v. Mann*, 904 So. 2d 1183, 1185 (¶12) (Miss. Ct. App. 2004)). Because Martha did not cite any relevant authority in support of her claim, we decline to review this claim on appeal.

### VI. Whether the chancellor erred by denying Martha's request for attorney's fees.

¶58. Martha claims that the chancellor should have awarded her attorney's fees. "The award of attorneys' fees in divorce cases is generally left to the discretion of the chancellor . . . ." *Daigle v. Daigle*, 626 So. 2d 140, 147 (Miss. 1993). "It is well-established that 'when a party is able to pay attorney's fees, award of attorney's fees is inappropriate.'" *Lenoir v. Lenoir*, 611 So. 2d 200, 2014 (Miss. 1992). "The party requesting attorney's fees has the burden of [proving his or her inability to pay]." *Deen v. Deen*, 856 So. 2d 736, 749 (¶16) (Miss. Ct. App. 2003).

¶59. At trial, Martha testified that she did not have the money to pay her attorney's fees, and the bill from her attorney was admitted into evidence. However, according to her own calculations, Martha has over $250,000 in assets. Because there is insufficient evidence in

the record that Martha was unable to pay her attorney's fees, we find that the chancellor did not abuse his discretion in denying her request for attorney's fees. *See Ilsley v. Ilsley*, 160 So. 3d 1177, 1184 (¶20) (Miss. Ct. App. 2014). This issue is without merit.

### VII. Whether the chancellor erred by allowing Martha to reopen her case and admitting Lisa English's testimony.

¶60. In his cross-appeal, Loyd claims that the chancellor erred by allowing Martha to reopen her case. He also claims that the chancellor erred by allowing English to testify because she had not been identified as a possible witness prior to trial. However, Loyd's cross-appeal is conditional in that he asks this Court to consider his claims only if we find merit to any of Martha's claims. Because we affirm, this issue is moot.

¶61. **AFFIRMED.**

**CARLTON AND J. WILSON, P.JJ., WESTBROOKS, TINDELL, McDONALD AND C. WILSON, JJ., CONCUR. McCARTY, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION. BARNES, C.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., NOT PARTICIPATING.**

**McCARTY, J., SPECIALLY CONCURRING:**

¶62. Almost immediately upon the start of this trial, it went awry. After a series of routine questions about what the wife did all day at her job, the husband's lawyer asked, "Have you had an extramarital relationship, since your marriage to my client?"

¶63. This is a divorce case, and the husband filed the action over a year prior to that question based upon an allegation of adultery, so there is nothing surprising about that line of inquiry.

¶64. But the wife's counsel objected and stated that he would be "instructing my client not

to answer it and to assert her privilege under the Fifth Amendment." The objection was because in his view that "[a]n extramarital affair would be considered adultery which is a criminal offense under Mississippi Law[.]"

¶65. The trial court had a few different options at this point.

¶66. The court could have sustained the objection and allowed the witness to remain silent (since the objection is wrong, as there is no crime against adultery in general).[7]

¶67. Or the court could have overruled the objection and proceeded to require the witness to testify (since it was unlikely that the wife was going to be prosecuted for adultery).[8]

¶68. The court could have also just told the parties to move along, since adultery or the lack of it was a paramount issue in the trial.[9]

---

[7] It is unlawful cohabitation conjoined with more than a single act of adultery that is a crime—a misdemeanor. Miss. Code Ann. § 97-29-1 (Rev. 2014); *see Miss. Dep't of Wildlife, Fisheries & Parks v. Bradshaw*, 196 So. 3d 1075, 1085 (¶26) (Miss. Ct. App. 2016) (holding that there is no general crime of adultery, but that the Code prohibits cohabitation when there is a "habitual . . . laying together").

[8] There have been prosecutions for adultery, but we do not see reported cases on it lately. *See Ratcliff v. State*, 234 Miss. 724, 728, 107 So. 2d 728, 729 (1958) (examining the law and the corollary prohibition on marriage between blacks and whites, which unlike the cohabitation crime, was a felony punishable with 10 years); *Housley v. State*, 198 Miss. 837, 839, 23 So. 2d 749, 749 (1945) (affirming dual convictions for unlawful cohabitation).

Although it is easy to see the objection as gamesmanship, we have reminded the Bar not too long ago "that cohabitation between persons not married to each other is against the law in Mississippi," and while "this law is frequently broken has been recognized by the supreme court," it remains on the books as a crime. *Sullivan v. Stringer*, 736 So. 2d 514, 516-17 (Miss. Ct. App. 1999). We ruled there that "[c]ommission of crimes by a custodial parent, even if they are only about sex, is properly the concern of a chancellor," although it should be added that the weight accorded to it is left to the trial court. *Id*.

[9] The same incorrect objection was lodged in *McDonald v. McDonald*, 69 So. 3d 61, 66 (Miss. Ct. App. 2011). We noted in passing that we would "decline to address the

21

¶69.	Instead, the trial court determined as follows:

> THE COURT: Well, I'm going to find against her on it. That's fine. She can do that [remain silent]. Is your client suing for a divorce on the grounds of adultery?
>
> MR. ROBERTS: My client is, yes, sir.
>
> THE COURT: Well, then, I will grant a divorce on the grounds of adultery. Alex, go ahead and type up a judgment, and I will go ahead and enter that.

¶70.	The wife was the very first witness at trial—no other proof had been heard, no other witnesses had testified, and as the majority points out, the burden of proof had not yet been met. Yet at this point, in the eyes of the parties, and from the pronouncement of the trial court, the trial on fault had concluded. There was nothing left to do to prove that issue because the trial was bifurcated as to other issues.

¶71.	As per the trial court, that very same day a "Final Judgment of Divorce" was granted to the husband, upon the finding that the wife committed adultery. Although the majority correctly notes that this judgment of divorce was set aside, this was only done so that the wife would not lose her insurance during the gap between this ruling and the later division of assets.[10]

¶72.	By these actions, no one could be reasonably assured that justice was done that day

question of whether [the husband] could have successfully been prosecuted for adultery . . . . " *Id.* at 66 n.2.

[10] The trial started on March 24, 2017. The later hearing for division of money occurred on September 15, 2017. The ruling of the court returned on October 3, 2017. It is somewhat concerning how the chancellor can allow such a lengthy record of time between the start of a trial and the completion of a trial without causing havoc in citizens' lives and unnecessary delay in receiving the legal relief this state's laws afford.

or that the chancellor could still be fair and impartial for the remainder of the trial. Without all of the facts, the chancellor made a split-second decision and memorialized that split-second decision in a written order. He had not yet heard all of the proof. It is disheartening to litigants (and to the law) and exerts undue concern on the impartiality of courts to act in such an ill-conceived decision-making process. Litigants should always believe they are being heard, all legal proceedings are fair, and the proceedings are in accordance with the law. Parties, lawyers, and witnesses should feel that their trial is the most important event in the world. In his book, Justice Griffith wrote that for "[e]very litigant, whatever his station in life, should be made to feel that the chancellor will see to it that respectful consideration will be extended to him personally, as well as to his cause; and the chancellor should be watchful that no witness is brow beaten, humiliated or abused by any party or solicitor." V.A. Griffith, Mississippi Chancery Practice § 93 (2d ed. 1950).

¶73. That former trial judge had much guidance to offer on the subject of the importance of trials, and how they should be conducted in a professional and dignified manner. We must remember that the chancellor very nearly always sits alone as the factfinder, and so "[t]he duty of courtesy on the part of the chancellor is particularly required in behalf of the parties and witnesses." *Id*. at § 92. While a difficult role to undertake, it must be performed with patience. "The duty of the chancellor to hear and to hear fully[]—without the distraction of disorder around him[]—involves also the duty that in so doing he shall hear the parties, their witnesses and solicitors with a becoming judicial patience and with a sincere and alert interest, and moreover that he shall hear them courteously." *Id*.

¶74. The majority performs a detailed and muscular review of this record in order to assure that we arrive at the correct conclusion, and I agree with that conclusion. There was ample proof the wife committed adultery. It should not have been necessary for the Court to salvage a decision, but with the record before us, that was required.

¶75. I likewise do not believe the chancery court should have *sua sponte* recused. If a party wants a recusal, the litigant needs to lace up and throw that punch on its own—not just hope the judge gets knocked out just because of wishful thinking. Given the proper request, the trial court's comment about the wife's hearing, conjoined with the immediate decision on the divorce, could have been more deeply considered on appeal.

¶76. Decades ago Justice Griffith described that merely reaching the correct result was not enough—that the profession and the populace of Mississippi were owed more than just a resolution of a legal dispute. For "howsoever competent the chancellor may be, and howsoever honest and impartial, he will still be unable to render righteous judgments unless he hear every matter fully and with an anxious interest that every that is legitimately to be said, both as to the material facts and as to every pertinent feature of the law, has been placed before him for his consideration." *Id*. at § 89.

¶77. For the foregoing reasons, I specially concur.